IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
June 29, 2022 Session

EUGENE MOXLEY v. AMISUB SFH, INC. D/B/A SAINT FRANCIS
HOSPITAL, ET AL.

Appeal from the Circuit Court for Shelby County
No. CT-4603-20     Jerry Stokes, Judge

———————————————————

No. W2021-01422-COA-R9-CV

———————————————————

In this interlocutory appeal of a health care liability action, the only issue for review is whether the trial court erred in denying the defendants' motions to dismiss based on its finding that "extraordinary cause" existed to excuse the plaintiff's failure to comply with the statutory pre-suit notice requirements. For the following reasons, we reverse and remand for further proceedings.

**Tenn. R. App. P. 9 Interlocutory Appeal by Permission; Judgment of the Circuit
Court Reversed and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which ARNOLD B. GOLDIN and KENNY W. ARMSTRONG, JJ., joined.

Karen S. Koplon and Megan E. Lane, Memphis, Tennessee, for the appellants, AMISUB (SFH), Inc. d/b/a St. Francis Hospital and Kirsna Norris Chapman.

Joseph M. Clark and R. Kent Francis, Memphis, Tennessee, for the appellants, Zachary K. Corr, M.D., and The Urology Group, PC.

W. Bryan Smith, Memphis, Tennessee, and A. Wilson Wages, Millington, Tennessee, for the appellee, Eugene Moxley.

**OPINION**

**I.    FACTS & PROCEDURAL HISTORY**

The complaint filed in this case alleges that Plaintiff Eugene Moxley was injured due to medical negligence during the course of a cancer treatment on July 5, 2019. On July

3, 2020, Plaintiff's counsel, A. Wilson Wages, sent the statutorily required pre-suit notice of a potential health care liability claim to twelve possible defendants. Tennessee Code Annotated section 29-26-121(a)(2)(E) provides that pre-suit notice must include "[a] HIPAA compliant medical authorization permitting the provider receiving the notice to *obtain* complete medical records from each other provider being sent a notice." (Emphasis added). Plaintiff admits that a mistake was made with respect to the HIPAA authorizations he sent to each provider. To illustrate, one potential defendant was Kirsna Norris Chapman ("Nurse Chapman"). The pre-suit notice letter sent to Nurse Chapman included twelve separate HIPAA authorization forms. Each of the twelve forms Ms. Chapman received designated her as the "releasing provider." Thus, the forms she received contained language stating that she could "release" medical records to other entities. For example:

> "I, Eugene T. Moxley, . . . do hereby authorize **Kirsna J. Norris-Chapman, R.N.**, to release to **The Urology Group**, the medical records . . . relating to my treatment[.]"

> "I, Eugene T. Moxley, . . . do hereby authorize **Kirsna J. Norris-Chapman, R.N.**, to release to **St. Francis Hospital-Memphis**, the medical records . . . relating to my treatment[.]"

> "I, Eugene T. Moxley, . . . do hereby authorize **Kirsna J. Norris-Chapman, R.N.**, to release to **Zachary K. Corr, M.D.**, the medical records . . . relating to my treatment[.]"

However, none of the twelve forms Nurse Chapman received contained language stating that she could "obtain" any medical records, although Plaintiff did send one authorization to Nurse Chapman that included her name in both fields as follows:

> "I, Eugene T. Moxley, . . . do hereby authorize **Kirsna J. Norris-Chapman, R.N.**, to release to **Kirsna J. Norris-Chapman, R.N.**, the medical records . . . relating to my treatment[.]"

The same mistake was repeated with the forms sent to all twelve potential defendants.

Three weeks later, on July 24 and July 25, 2020, Plaintiff sent out a second round of pre-suit notice letters to the potential defendants. Many of those included an explanation to the effect that the return receipt cards for the first notices had notations regarding "Covid-19" or something similar, such that Plaintiff's counsel was unable to confirm who signed for the notice letters. The same mistake was made again with all of the HIPAA authorization forms sent in the second round of pre-suit notice letters.

On July 29, 2020, Plaintiff sent another pre-suit notice letter to one of the potential defendants -- AMISUB SFH, Inc. d/b/a St. Francis Hospital -- in an effort to "serve the

correct corporate entity" for St. Francis Hospital. Yet again, all of the authorization forms enclosed with the notice allowed St. Francis to release records but did not state that it could obtain records.

On October 30, 2020, Plaintiff initiated this lawsuit by filing a complaint against four defendants – Nurse Chapman, The Urology Group, PC, Dr. Zachary Corr, and St. Francis Hospital. Plaintiff's counsel, Mr. Wages, attached an affidavit stating that he had complied with the pre-suit notice requirements and, among other things, sent "a HIPAA compliant medical authorization permitting the providers who were sent a notice to obtain medi[c]al records from the other providers." He attached all of the pre-suit notice letters and enclosed authorization forms sent on the dates mentioned above.

On January 25, 2021, St. Francis and Nurse Chapman filed a motion to dismiss pursuant to Tennessee Rule of Civil Procedure 12.02(6), alleging failure to comply with Tennessee Code Annotated section 29-26-121(a)(2)(E).[1] St. Francis and Nurse Chapman pointed out that the HIPAA authorization forms they received with pre-suit notice allowed each of them to "release" medical records but did not state that they could procure records from other providers. As such, they argued that Plaintiff had failed to substantially comply with the statute's requirement that pre-suit notice include "[a] HIPAA compliant medical authorization permitting the provider receiving the notice to obtain complete medical records from each other provider being sent a notice." Tenn. Code Ann. § 29-26-121(a)(2)(E). Noting the severe penalties that providers face for HIPAA violations, St. Francis and Nurse Chapman asserted that they did not have access to the other providers' medical records and were deprived of the investigatory benefit the statute provides. Due to the alleged deficiency with pre-suit notice, they argued that Plaintiff was not entitled to rely on the 120-day extension to the statute of limitations, and his complaint was time-barred. They attached the relevant forms to their motion to dismiss. Dr. Corr and The Urology Group filed a separate motion to dismiss on the same grounds, attaching the forms they received. They likewise asserted that the HIPAA authorizations were "one-sided" in that they only allowed disclosure of records and did not allow them to obtain records as required by the statute.

Although the initial motion to dismiss was filed in January, no response had been

---

[1] They relied on *Myers v. AMISUB (SFH), Inc.*, 382 S.W.3d 300, 307 (Tenn. 2012), in which the Court explained:

> The proper way for a defendant to challenge a complaint's compliance with Tennessee Code Annotated section 29-26-121 . . . is to file a Tennessee Rule of Procedure 12.02 motion to dismiss. In the motion, the defendant should state how the plaintiff has failed to comply with the statutory requirements by referencing specific omissions in the complaint and/or by submitting affidavits or other proof. Once the defendant makes a properly supported motion under this rule, the burden shifts to the plaintiff to show either that it complied with the statutes or that it had extraordinary cause for failing to do so.

- 3 -

filed by Plaintiff when the defendants filed a "Notice of Hearing" on April 16, 2021, setting the hearing date for May 21. However, on May 11, Plaintiff filed a response to both motions. The response stated at the outset:

> This case arises from an envelope-stuffing mistake. Plaintiff prepared HIPAA-compliant medical releases to be sent to each provider receiving presuit notice of suit pursuant to Tenn. Code Ann. § 29-26-121(a)(2)(E). But when the releases were put into envelopes, each provider was sent a release allowing the provider to disclose medical records to the other providers receiving notice rather than a release allowing the provider to obtain records from those other providers. But that is "substantial compliance" with the "content requirements" contained in Tenn. Code Ann. § 29-26-121(a)(2)(E) in that defendants are not prejudiced by it. They can each obtain medical records with the releases served. . . .

Plaintiff suggested that "Nurse Chapman, for example, could obtain records from Dr. Corr because Dr. Corr had a release in hand allowing him to release records to Nurse Chapman." Plaintiff contended that Nurse Chapman "could use the releases" in the hands of the other providers, and all she had to do was "make the request[.]"

St. Francis and Nurse Chapman filed a reply, which was later joined by The Urology Group and Dr. Corr. The defendants contended that they had met their initial burden in their motions to dismiss and that the burden had shifted to Plaintiff to show that he complied with the statutes or had extraordinary cause for failing to do so. *See Myers*, 382 S.W.3d at 307. They maintained that the authorization forms did not permit them to obtain medical records, and therefore, there was no substantial compliance. The defendants cited *Parks v. Walker*, 585 S.W.3d 895, 897-99 (Tenn. Ct. App. 2018), in which this Court concluded that authorizations sent to each defendant authorizing it "to release, use or disclose" the plaintiff's health records to the other providers were "not sufficient to enable defendants to obtain plaintiff's medical records." The defendants also pointed out that Plaintiff had not pled "extraordinary cause" in response to their motions to dismiss, but in the event that Plaintiff raised the argument, they suggested that an envelope stuffing error was a mere clerical error that would not amount to extraordinary cause.

At 5:00 p.m. on the evening before the May 21 hearing, Mr. Wages e-filed an affidavit. In that affidavit, Mr. Wages stated, "Because of everything going on and the disruptions in the office because of the pandemic, and its effect on my homelife, I just missed the fact that the HIPAA authorizations were not enclosed in the correct envelopes." He elaborated somewhat on the circumstances. First, Mr. Wages stated that it was "difficult and took longer than expected" to obtain an expert review "given the turmoil in my office and ongoing pandemic." He said the physicians he contacted were busy and hard to reach. Mr. Wages said his office received the expert review "at the end of June, 2020 and were then left scrambling to get the notice letters served on the potential

defendants." However, Mr. Wages said that he was able to properly serve the notices, postmarked July 3. He suggested that each provider should have known that authorizations had been sent to all of the other potential defendants allowing the "release" of records, such that "everyone involved could obtain copies of the relevant records" if they simply called and requested them.

Mr. Wages also explained how "the 'extraordinary circumstance' of the Covid-19 pandemic" had impacted his family. He explained that his 87-year-old mother-in-law was suffering from dementia and living with him and his wife. He said his wife stopped working to stay home and care for her, but she needed his assistance when moving her, so it was necessary for him to assist them in the mornings and be back home by 4:00 p.m. Mr. Wages said he also served as municipal judge and had to continue fulfilling his responsibilities in that capacity, but Covid-19 "made [his] workplace an ever more dangerous environment." He said that two individuals were employed full-time in his law office but that both were considered high risk for the virus due to a skin cancer diagnosis and pulmonary issues. He said, "In order to protect my employees to the best of my ability, we all social distanced as suggested by the CDC. The 3 of us were not in the same room at the same time. I purchased protective shields for their desks and I no longer allowed access to our office to anyone other than the 3 of us." He said he "just missed the fact that the HIPAA authorizations were not enclosed in the correct envelopes" because of "everything going on and the disruptions in the office because of the pandemic, and its effect on my homelife."

On the same day as the hearing, St. Francis and Nurse Chapman filed a supplemental memorandum in response to the late-filed affidavit, which was again joined by Dr. Corr and The Urology Group. They pointed out that the affidavit filed by Mr. Wages did not allege that he, his staff members, or his family members had ever contracted Covid-19 or, for that matter, any other illness. They also suggested that Mr. Wages failed to sufficiently explain the "turmoil" that allegedly led to the mistake, as he did not explain how any envelope stuffing error occurred, why it occurred, or whether it was linked in any way to the pandemic or caring for his mother-in-law. The defendants suggested that there were many solo practitioners in Shelby County who were social distancing during the Covid-19 pandemic and that there was nothing remarkable or extraordinary about the circumstances Mr. Wages faced. They argued that finding "extraordinary cause" under these circumstances "would open up pandora's box for utilizing the pandemic in general with nothing more specific or personal tied to counsel's circumstance[s] to forgive compliance with the statute." They cited *Hawkins v. Martin*, No. W2013-02102-COA-R3-CV, 2014 WL 2854256, at *9 (Tenn. Ct. App. June 23, 2014), in which this Court affirmed a trial court's finding of no extraordinary cause when the plaintiff's attorney was an Army reservist who claimed stress due to an upcoming deployment, but there was no evidence "on the effect the news of deployment may have had on [his] mental or emotional state" and the trial court was unwilling to assume that a solo practitioner under those circumstances "would be unable to function effectively as a lawyer." Thus, the defendants

argued that Plaintiff, as in *Hawkins*, had not shown extraordinary cause and that a mere mistake, oversight, or clerical error was insufficient.

At the hearing on the motions to dismiss, Plaintiff's counsel argued that a "clerical error . . . [is] . . . not what we're claiming. What we're claiming is there was a worldwide pandemic." However, the defendants maintained that Mr. Wages had not shown any connection between Covid-19 and the envelope stuffing mistake he claimed had occurred. According to the defendants, Plaintiff had not shown that "the COVID pandemic [was] the reason" the authorizations they received did not allow them to obtain records. They maintained that Plaintiff "just made a mistake" and "what it boils down to [is] a clerical error; and that is not extraordinary."

A few days after the hearing, Mr. Wages filed a supplemental affidavit in an effort "to provide additional details about the circumstances." Mr. Wages stated that Plaintiff retained him to investigate a potential health care liability claim arising out of the care he received on or about July 5, 2019, but "before I was able to complete my merit review and serve pre-suit notice letters," the Covid-19 pandemic began in March 2020. He said he was "in the process of retaining an expert to review the case [] when the pandemic hit." Mr. Wages said the expert review process "took longer than expected given the turmoil in my office and ongoing pandemic." Mr. Wages also stated that "disruptions in my office made it difficult for my staff and me to focus on this case as the deadline for serving pre-suit notice letters approached." He again stated that he received the expert review "at the end of June" and was "left scrambling to get the notice letters served."

Next, Mr. Wages elaborated on the situation with his mother-in-law, stating that she lived in his household "throughout the COVID-19 pandemic." He said he was the only one in his household who left home to run errands in order to reduce any exposure to the virus, so "it was necessary for me to expend large amounts of time out of the office and put a heavy burden on me in addition to the professional burden of maintaining my solo practice and performing my duties as a city judge."

Mr. Wages again stated that his two full-time employees were considered high risk for the virus, which led him to be "very strict about the CDC guidelines." He said that enforcing these restrictions "made it difficult for my staff and me to coordinate and work together" and "disrupted the ongoing day to day operation of my office." He also said his office was "set up to work from home by May, but then our system was hacked by ransomware adding to the stress I was already under." Mr. Wages said he regained access to the system during "the first few weeks of June, but it took well past the July 4th Holiday to clean up the mess caused by the ransomware." He said it took "a long time" for him and his staff to make sure all files were regained, calendars were not affected, and deadlines were not missed, which "was extremely upsetting to me." He added, "More than ever before, I had to rely on my family support and staff to keep my practice running." Mr. Wages said his legal assistant had surgery for skin cancer in January 2020 and was out of

the office from June 23 until June 26 because of dental surgery. He stated that he "had been relying heavily on [his assistant] due to all the personal and professional turmoil in my life at the time, and her absences . . . put more pressure and stress on me. I simply did not have the time to do everything that needed to be done at home and work." He said the absence of his assistant "made it harder to clean up the mess caused by the ransomware and put us behind on other matters in the office which caused additional confusion as we were working on preparing the pre-suit notice letters in this case." Mr. Wages also said that his brother-in-law was admitted to the hospital with pneumonia "shortly before the July 5, 2020 deadline for serving pre-suit notice letters," which caused him to be concerned for his welfare. Mr. Wages said "[w]e were able to properly serve the notice letters . . . dated July 2, 2020, postmarked July 3, 2020." However, he added,

> Unfortunately, when my office put the releases in the envelopes with the pre-suit notice letters, each provider was sent a release allowing the provider to disclose medical records to the other providers receiving notice rather than a release allowing the provider to obtain records from those other providers. I was under an inordinate amount of stress, with the added stress of taking care of my disabled mother-in-law during the pandemic without help, the disruptions caused by enforcing CDC guidelines in my solo practice, my legal assistant's absences from the office, and the mess and stress caused by the ransomware hack, and found it hard to focus at and around the time the pre-suit notice letters were sent out in this case. Because of everything going on, the disruptions in the office caused by the ongoing pandemic and their effects on my homelife, as described above, I missed the fact that the HIPAA releases were not enclosed in the correct envelopes. Ultimately, I do not believe this mistake caused any prejudice to the Defendants because, as noted above, each provider receiving notice was able to obtain complete records from each other provider being sent notice. However, I normally would have caught and corrected this error if it had not been for my state of mind at the time my office served the pre-suit notice letters in this case.

This concluded counsel's supplemental affidavit.

On July 26, 2021, the trial court entered an order denying the defendants' motions to dismiss. Initially, the order states that Plaintiff timely sent pre-suit notice letters to each provider but that the enclosed HIPAA authorizations "did not allow that provider to obtain Plaintiff's records from the other providers." Because the authorizations did not strictly allow the potential defendants to obtain medical records, the court found that the defendants did not receive the benefit of the statute. The court noted the holding in *Parks v. Walker* that an authorization only allowing the receiving provider to release records does not substantially comply with the statute.

However, the trial court observed that it had discretion to excuse compliance with Tennessee Code Annotated section 29-26-121(a)(2) if it found that extraordinary cause existed. The court noted that Mr. Wages had filed two affidavits listing the following circumstances that were occurring at his home and/or office: he was a solo practitioner; he and his wife were caring for his 87-year-old mother-in-law at their home, which required him to come home from work periodically to help; his office computer was hacked with ransomware, which took two months to address; he had two office assistants who were high-risk for Covid-19, and one underwent skin cancer surgery in January 2020 and had dental surgery in June, putting additional stress on Mr. Wages; the pandemic caused his office to work remotely and socially distance; the pandemic limited him in his efforts to obtain experts in a timely manner in the period leading up to the mailing of pre-suit notices; his brother-in-law was admitted to the hospital with pneumonia; and Mr. Wages served as a municipal judge holding court twice a week during this time. The court noted that "Mr. Wages asserts that all of the above caused him substantial stress, and further, that Covid-19 prevented his office from functioning as a unit because of safety protocols[.]" The trial court found that "each individual reason cited by Mr. Wages, standing alone, does not constitute extraordinary cause for not complying with the stat[ut]e." Nevertheless, the trial court stated that "the cumulative effect of all the reasons" led the court to exercise its discretion to find that there was extraordinary cause. It found that "all of the above events at his house and work contributed to Mr. Wages not being mentally ready to recognize that the HIPAA authorizations were sent just to the providers to release their own records and they were not put in envelopes to allow those providers to obtain medical records from the other providers."

Upon the denial of their motions to dismiss, the defendants jointly filed a motion to alter, amend, or revise the order, or in the alternative, a motion for interlocutory appeal. They emphasized that Mr. Wages must have made the same so-called envelope stuffing mistake repeatedly, for each batch of notice letters sent out on July 2, July 24, July 25, and July 29. The defendants argued that Mr. Wages failed to adequately explain how a mere envelope stuffing mistake could have been repeated four times when he said he "normally would have caught" such an error but for the stress. The defendants argued that such repeated mistakes should not be excused on the basis of *extraordinary* cause. They also noted that on the final date when a notice was sent, "Plaintiff had only one envelope to stuff," and therefore, the claim that Plaintiff's counsel was not mentally able to recognize the mistake was not persuasive or excusable. In response, however, Plaintiff's counsel argued that the fact that the mistake was repeated several times demonstrated just how "crippling" the stress was.

The trial court denied the motion to alter or revise the order but granted the defendants permission to seek an interlocutory appeal. This Court granted the application for permission to appeal and framed a single issue for review: whether the trial court erred in denying the defendants' motions to dismiss as a result of its finding that "extraordinary cause" existed.

## II. DISCUSSION

The Tennessee Supreme Court set forth the following principles that guide our analysis in *Myers*, 382 S.W.3d at 307-08:

> The proper way for a defendant to challenge a complaint's compliance with Tennessee Code Annotated section 29-26-121 and Tennessee Code Annotated section 29-26-122 is to file a Tennessee Rule of Procedure 12.02 motion to dismiss. In the motion, the defendant should state how the plaintiff has failed to comply with the statutory requirements by referencing specific omissions in the complaint and/or by submitting affidavits or other proof. Once the defendant makes a properly supported motion under this rule, the burden shifts to the plaintiff to show either that it complied with the statutes or that it had extraordinary cause for failing to do so. Based on the complaint and any other relevant evidence submitted by the parties, the trial court must determine whether the plaintiff has complied with the statutes. If the trial court determines that the plaintiff has not complied with the statutes, then the trial court may consider whether the plaintiff has demonstrated extraordinary cause for its noncompliance. If the defendant prevails and the complaint is dismissed, the plaintiff is entitled to an appeal of right under Tennessee Rule of Appellate Procedure 3 using the standards of review in Tennessee Rule of Appellate Procedure 13. If the plaintiff prevails, the defendant may pursue an interlocutory appeal under either Tennessee Rule of Appellate Procedure 9 or 10 using the same standards.
>
> Because the trial court's denial of the Defendants' motion involves a question of law, our review is de novo with no presumption of correctness. *Graham v. Caples*, 325 S.W.3d 578, 581 (Tenn. 2010). The question of whether [the plaintiff] has demonstrated extraordinary cause that would excuse compliance with the statutes is a mixed question of law and fact, and our review of that determination is de novo with a presumption of correctness applying only to the trial court's findings of fact and not to the legal effect of those findings. *Starr v. Hill*, 353 S.W.3d 478, 481-82 (Tenn. 2011). We review the trial court's decision to excuse compliance under an abuse of discretion standard. "A court abuses its discretion when it applies an incorrect legal standard or its decision is illogical or unreasonable, is based on a clearly erroneous assessment of the evidence, or utilizes reasoning that results in an injustice to the complaining party." *Wilson v. State*, 367 S.W.3d 229, 235 (Tenn. 2012) (citing *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011)).

In this interlocutory appeal, the trial court's initial ruling that Plaintiff failed to substantially comply with the pre-suit notice statute is not before us. We are only reviewing the trial court's subsequent ruling that the plaintiff demonstrated extraordinary cause for the

noncompliance.

In *Myers*, the Tennessee Supreme Court also elaborated on the meaning of extraordinary cause:

> Tennessee Code Annotated section 29-26-121 allows the trial court to exercise "discretion to excuse compliance . . . only for extraordinary cause shown." Tenn. Code Ann. § 29-26-121(b). The statute does not define "extraordinary cause," and the statute's legislative history does not indicate that the legislature intended to assign a meaning to that phrase other than its plain and ordinary meaning. "Extraordinary" is commonly defined as "going far beyond the ordinary degree, measure, limit, etc.; very unusual; exceptional; remarkable." *Webster's New World Dictionary of the American Language*, 516 (1966); *see also State v. Vikre*, 86 N.C. App. 196, 356 S.E.2d 802, 804 (1987) (adopting dictionary definition of extraordinary cause as "going beyond what is usual, regular, common, or customary ... of, relating to, or having the nature of an occurrence or risk of a kind other than what ordinary experience or prudence would foresee"). One legal scholar, commenting on Tennessee Code Annotated sections 29-26-121 and 122, has noted that possible examples of "extraordinary cause" might include "illness of the plaintiff's lawyer, a death in that lawyer's immediate family, [or] illness or death of the plaintiff's expert in the days before the filing became necessary."

*Myers*, 382 S.W.3d at 310-11. In *Myers*, the Court noted that the plaintiff "failed to give any reason for his failure to comply with the statutory requirements, much less demonstrate extraordinary cause." *Id.* at 311.

In *Stevens ex rel. Stevens v. Hickman Community Health Care Services, Inc.*, 418 S.W.3d 547 (Tenn. 2013), however, the Supreme Court had a better opportunity to apply its definition of extraordinary cause. In that case, the plaintiff sent "a non-HIPAA compliant medical authorization that only permitted the release of medical records to plaintiff's counsel." *Id.* at 551. The plaintiff advanced three arguments that the trial court found persuasive in finding extraordinary cause. *Id.* at 557. The first was that the plaintiff, Mr. Stevens, had died before the lawsuit was filed. *Id.* at 559. The Supreme Court rejected this basis for finding extraordinary cause:

> Although Mr. Stevens' death might have been unexpected, his death does not constitute extraordinary cause. While Mr. Stevens obviously could not sign the HIPAA medical authorization after his own death, the death of a decedent will necessarily be involved in every wrongful death claim, and his personal representative could easily have complied with this requirement in his stead. *See* Tenn. Code Ann. § 63-2-101(b)(3) (2010) ("If the patient becomes

- 10 -

incapacitated or dies, and there is no legal representative for the patient, the patient's next of kin will be considered to be an authorized representative for the patient."); 45 C.F.R. § 164.502(g)(4) ("If under applicable law an executor, administrator, or other person has authority to act on behalf of a deceased individual or of the individual's estate, a covered entity must treat such person as a personal representative under this subchapter."). Because Mr. Stevens' death did not prevent his personal representative from complying with the pre-suit notice requirements of Tenn. Code Ann. § 29-26-121(a)(2)(E), Mr. Stevens' death did not constitute the extraordinary cause necessary to excuse Plaintiff's failure to comply.

*Id.* The next factors the trial court had cited were that the defendants had actual notice of the lawsuit and that the plaintiff complied with the statutory requirement of filing a certificate of good faith. *Id.* The Court concluded that these facts did not excuse the plaintiff's failure to comply with the statutory requirements either. *Id.* Finally, the plaintiff argued that her failure to comply should be excused because the defendants did not inform her that the HIPAA authorization was deficient before filing a motion to dismiss. *Id.* Again, this reason was insufficient. The Court noted that it was the plaintiff's responsibility to comply with the statutory requirements, not the defendants. *Id.* As a result, the Supreme Court concluded that "the trial court abused its discretion when it excused Plaintiff's failure to comply with the requirements of Tenn. Code Ann. § 29-26-121(a)(2)(E) in the absence of extraordinary cause." *Id.*

The Tennessee Supreme Court examined the issue of extraordinary cause again in *Bidwell ex rel. Bidwell v. Strait*, 618 S.W.3d 309 (Tenn. 2021). A provision had been added to the pre-suit notice statute in 2015 providing that a health care provider who receives such notice "'shall, within thirty (30) days of receiving the notice, based upon any reasonable knowledge and information available, provide written notice to the potential claimant of any other person, entity, or health care provider who may be a properly named defendant.'" *Id.* at 315. (quoting Tenn. Code Ann. § 29-26-121(a)(5)). In *Bidwell*, the plaintiff argued that the defendants' failure to comply with this new subsection constituted extraordinary cause that should excuse its failure to provide pre-suit notice to an additional defendant. *Id.* at 321. The Court repeated its analysis from *Myers* defining the "plain and ordinary meaning" of the term "extraordinary," as "going far beyond the ordinary degree, measure, limit, etc.; very unusual; exceptional; remarkable." *Id.* at 322 (quoting *Myers*, 382 S.W.3d at 310-11). It also repeated the examples listed in *Myers*, noting that extraordinary cause might include "illness of the plaintiff's lawyer, a death in that lawyer's immediate family, [or] illness or death of the plaintiff's expert in the days before the filing became necessary." *Id.* The Supreme Court ultimately agreed with the trial court's observation that although the plaintiff found "misinformation" during his pre-suit investigation that may have "caused confusion" and "created difficulty" for the plaintiff, the facts did not give rise to extraordinary cause. *Id.* The Court noted that even if it accepted the plaintiff's assertion that its failure to provide pre-suit notice to the additional

- 11 -

defendant resulted from other defendants' failure to comply with the statutory notification requirement, "we cannot agree that this is enough, standing alone, to constitute extraordinary cause in this case," even though it led to "harsh results" for the plaintiff. *Id.* The Court did state, however, that "a trial court may conclude in another case that a defendant's failure to comply with [the notification requirement] constitutes extraordinary cause," but extraordinary cause simply "did not exist in the case on appeal." *Id.*

As these cases demonstrate, "[o]ur Supreme Court has defined 'extraordinary cause' narrowly" and provided some possible examples. *Owens v. Stephens*, No. E2018-01564-COA-R3-CV, 2020 WL 1888901, at *5 (Tenn. Ct. App. Apr. 16, 2020), *perm. app. denied* (Tenn. Sept. 16, 2020). This Court has likewise construed and applied "extraordinary cause" narrowly. For instance, in *Moore-Pitts v. Bradley*, 605 S.W.3d 24, 28, 33 (Tenn. Ct. App. 2019), the plaintiff sent pre-suit notice to approximately forty providers and left a blank on the HIPAA authorization, yet we concluded that these circumstances were "not extraordinary" as it is "not uncommon or extraordinary for a plaintiff to have received treatment from numerous providers prior to a healthcare liability action being filed or even considered." In *J.A.C. by & through Carter v. Methodist Healthcare Memphis Hospitals*, 542 S.W.3d 502, 517-18 (Tenn. Ct. App. 2016), we found that the plaintiff's mistaken reliance on a federal agency's website regarding HIPAA did not "rise to the level of extraordinary cause" because the "proffered excuse relates solely to their claimed ignorance as to what was necessary to comply with the statute," which "does not justify a finding of extraordinary cause." In *Smith v. Wellmont Health System*, No. E2017-00850-COA-R9-CV, 2018 WL 3343591, at *4 (Tenn. Ct. App. July 9, 2018), we concluded that a trial court abused its discretion in finding extraordinary cause to excuse compliance where the plaintiff's counsel complied with a "local custom" of utilizing blank medical authorizations that were not HIPAA compliant. And, in a case where a plaintiff provided a HIPAA authorization with an expiration date that had already passed, we affirmed the trial court's finding that such a "clerical error" does not constitute extraordinary cause. *See Byrge v. Parkwest Med. Ctr.*, 442 S.W.3d 245, 251 (Tenn. Ct. App. 2014); *see also Shockley v. Mental Health Coop.*, Inc., 429 S.W.3d 582, 584 (Tenn. Ct. App. 2013) (finding no extraordinary cause where the pre-suit notice contained a misnomer naming a separate entity instead of the proper defendant). Thus, as one author noted, "lawyers cannot count on safe harbor by using the extraordinary cause provision," as it "is a high threshold that will not excuse the vast majority of errors." Clinton L. Kelly, *Medical Malpractice Five Years After Going Under the Knife, Med Mal Law Is Still Feeling the Effects*, 49 Tenn. B.J. 12, 15 (Nov. 2013).

It is helpful to note some cases in which this Court *has* found extraordinary cause. In *Reed v. West Tennessee Healthcare, Inc.*, 577 S.W.3d 534, 539 (Tenn. Ct. App. 2018), the plaintiff retained legal counsel to file a health care liability action on his behalf "well before the expiration of the statute of limitations," but his counsel terminated the representation shortly before the statute of limitations expired, leaving him unrepresented. He filed a pro se complaint, and the trial court found extraordinary cause for his

- 12 -

noncompliance with the statutes, reasoning that "the Healthcare Liability Act did not contemplate a party, who had hired a lawyer to handle the technical aspects of an action, having to learn the Healthcare Liability Act in two (2) weeks[.]" *Id.* at 536. On appeal, we found no abuse of discretion and agreed that these circumstances "constitute the type of extraordinary cause contemplated" by the statutes. *Id.* at 539. Although we recognized that merely "being pro se does not constitute extraordinary cause," we explained that the plaintiff's pro se status was "not the entire factual situation here." *Id.* at 538-39. Considering the entirety of the circumstances, we found the situation akin to the examples listed in *Myers*, where a lawyer dies "'in the days before the filing became necessary,'" which would leave a client suddenly unrepresented just prior to the expiration of the statute of limitations. *Id.* (quoting *Myers*, 382 S.W.3d at 311). Thus, we affirmed the finding of extraordinary cause. *Id.*

Additionally, in *Kirby v. Sumner Regional Medical Center*, No. M2015-01181-COA-R3-CV, 2016 WL 3914189, at *1-2 (Tenn. Ct. App. July 12, 2016), we concluded that extraordinary cause for noncompliance existed where the plaintiff's counsel's infant son died just four days prior to the filing of the complaint and had endured serious hospitalizations in the months before his death. Counsel admittedly was "unable to give specifics regarding [his] thought process" at the time he filed the complaint but said he was extremely upset and not thinking clearly after his son died, was unable to take any time off work from his solo practice, and "went from courthouse to courthouse . . . in a somewhat zombie-like state." *Id.* at *2. We quoted the examples listed in *Myers*, which include "'a death in that lawyer's immediate family.'" *Id.* at *6 (quoting *Myers*, 382 S.W.3d at 311). We also acknowledged counsel's difficulty in maintaining his practice during the short life of his son and in the days following his passing. *Id.* With those considerations in mind, we concluded that the trial court's refusal to excuse compliance was "not within a range of acceptable alternatives given the applicable legal principles," and we reversed the decision of the trial court. *Id.*

On appeal, both sides characterize the situation before us as one involving attorney oversight. This Court has consistently held that "[a]ttorney oversight, absent unique circumstances, does not constitute extraordinary cause." *Igou v. Vanderbilt Univ.*, No. M2013-02837-COA-R3-CV, 2015 WL 1517794, at *9 (Tenn. Ct. App. Mar. 27, 2015); *see, e.g.*, *Travis v. Cookeville Reg'l Med. Ctr.*, No. M2015-01989-COA-R3-CV, 2016 WL 5266554, at *9 (Tenn. Ct. App. Sept. 21, 2016) (noting that plaintiff's counsel simply failed to retain a copy of an allegedly signed form and that "[t]his oversight does not rise to the level of extraordinary cause"); *DePue v. Schroeder*, No. E2010-00504-COA-R9-CV, 2011 WL 538865, at *8 (Tenn. Ct. App. Feb. 15, 2011) (finding that counsel's actions were "not shown to be the result of any 'extraordinary cause' other than pure oversight/misunderstanding on her part").

This principle is clearly illustrated in *Hawkins v. Martin*, No. W2013-02102-COA-R3-CV, 2014 WL 2854256 (Tenn. Ct. App. June 23, 2014), which both sides have cited

on appeal as supportive of their own positions. We examine it in depth because of many similarities between it and the present case. In *Hawkins*, the attorney for the plaintiff sent pre-suit notice letters but "inadvertently failed to provide the defendant health care providers with medical authorizations that complied" with the statutory requirements. *Id.* at *1. The plaintiff's counsel, Mr. O'Neal, practiced law as a solo practitioner but also served as a reservist in the Army National Guard. *Id.* Around the time when he was preparing to file the health care liability action, he had learned that he would be deployed. *Id.* The defendants moved to dismiss based on his failure to comply with the statute. *Id.* at *2. Mr. O'Neal claimed that he was normally "meticulous" in his process and that he did not understand how the mistake could have happened "but for my military situation." *Id.* The trial court implicitly credited Mr. O'Neal's testimony but held that he did not show extraordinary cause, believing that "attorney oversight, no matter the circumstances, could not rise to the level of 'extraordinary circumstances' under the statute," so his "hands [were] tied." *Id.* at *3. In the first appeal to this Court, we concluded that the trial court erred in interpreting caselaw to foreclose a finding of extraordinary cause in any case involving attorney inadvertence. *Id.* We explained,

> We have held that mere attorney oversight, unaccompanied by extraordinary circumstances, does not constitute extraordinary cause. We have not held, however, that a trial court does not have the discretion to excuse compliance for attorney oversight *caused by* unique and extraordinary circumstances.

*Id.* (quoting *Hawkins v. Martin*, No. W2011-02318-COA-R3-CV, 2012 WL 3007680, at *6 (Tenn. Ct. App. July 24, 2012)) (emphasis added). Simply put, "the *reason* for the attorney oversight must be considered in determining whether the overall circumstances constitute extraordinary cause." *Id.* Thus, in the first appeal, we vacated the trial court's ruling and remanded with directions for it to weigh the totality of the circumstances to determine whether there was extraordinary cause. *Id.*

On remand, the parties submitted additional evidence on that issue. *Id.* at *4. However, the trial court again granted the motion to dismiss, finding no extraordinary cause. *Id.* Although Mr. O'Neal had shifted his argument on remand to include "the stress of a solo practitioner wrapping up his practice in anticipation of deployment," the trial court noted that it was not provided with any expert proof regarding Mr. O'Neal's state of mind, and the court was unwilling "to assume or infer that a sole practitioner, faced with active duty in the military at some time in the future, would be unable to function effectively as a lawyer." *Id.* Considering all the circumstances, the trial court concluded that Mr. O'Neal "had ample time before deployment to comply with the statute" and that he failed to meet his burden of proving extraordinary cause. *Id.* On appeal, this Court affirmed. We agreed with the plaintiff's general assertion that "where an attorney receives notice that he will be deployed to Afghanistan shortly before he must file the required pre-suit notice and the attorney is anxious and concerned about the upcoming deployment, the plaintiff *may* be able to establish 'extraordinary circumstances' within the meaning of the statute." *Id.* at

- 14 -

*8 (emphasis added). "Unfortunately," we added, "in this case, the evidence in the record lacks the force and clarity of the Plaintiff's impassioned argument" on appeal. *Id.* In fact, the evidence supported "only fragments of the facts" cited by the plaintiff on appeal. *Id.* There were discrepancies regarding the relevant dates when Mr. O'Neal received notice from the Army. *Id.* Thus, the evidence did not preponderate against the trial court's conclusion that Mr. O'Neal had actually learned of his deployment "well after the pre-suit notices were sent." *Id.* In addition, although the plaintiff relied on her counsel's "frame of mind" when he found out about his deployment, the actual evidence in the record did not convey "the dread and concern for his personal safety" that the plaintiff suggested had affected his ability to attend to detail in filing the pre-suit notices. *Id.* at *9. Mr. O'Neal said only that he was "probably out of the office more than I was in the office being trained up for the mission," and he expressed bewilderment at how the mistake could have occurred, saying he did not know how it could have been possible but for his military situation. *Id.* Notably, however, we said "[t]he record contains *no* evidence, testimonial or otherwise, on the effect the news of deployment may have had on Mr. O'Neal's mental or emotional state." *Id.* We were careful to note that we were not holding that expert proof on the attorney's mental or emotional state is *required* in order to establish extraordinary cause. *Id.* at *9 n.3. Still, "[g]iven this hole in the evidence," we noted that the trial court was simply unwilling to assume or infer that a solo practitioner under those circumstances would be unable to function effectively as a lawyer. *Id.* at *9. Considering all of the evidence, we could not say that the trial court abused its discretion in holding that the plaintiff did not establish extraordinary cause. *Id.*

In the case before us, the defendants argue that this case is like *Hawkins* and that Mr. Wages failed to supply any evidence regarding his mental or emotional health or show that his personal stress was the reason for the oversight. On the other hand, Plaintiff argues that Mr. Wages supplied the necessary proof to link his emotional state to the mistake. He suggests that the anxiety and concern Mr. Wages faced "is at least analogous to the anxiety and concern that would arise from an impending military deployment." Thus, we re-examine the evidence submitted by Plaintiff on this issue, keeping in mind that "the plaintiff bears the burden of proving extraordinary cause for a failure to comply with the statutory requirements[.]" *Hawkins*, 2014 WL 2854256, at *7.

In the affidavit Mr. Wages filed the night before the hearing, he first stated that he needed to obtain an expert review before sending out pre-suit notice letters and that this "was difficult and took longer than expected given the turmoil in my office and ongoing pandemic." However, he conceded that he received the review "at the end of June." Although Mr. Wages said he was "left scrambling to get the notice letters served on the potential defendants," he conceded that "[w]e were able to properly serve the notice letters dated July 2, 2020, postmarked July 3, 2020[.]" We conclude that these circumstances were not extraordinary.

Next, Mr. Wages stated,

- 15 -

Due to the 'extraordinary circumstance' of the Covid-19 pandemic, my wife and I decided that I would be the 'canary in the coal mine' and would be the one person in our family to go into stores to pick up groceries, medications and anything else that needed to be purchased for our home in order to reduce the risk of exposing anyone in our home to the virus, including my 87-year-old mother-in-law [] who came to live in our home after the death of her husband of 60 years.

He went on to describe his mother-in-law's dementia and his daily routine and schedule in caring for her, stating that he had to help his wife care for her in the mornings and be back home by 4:00 p.m. in order to help with the evening routine. He also described his duties and schedule as a municipal judge. However, the original affidavit simply failed to provide any link between counsel's busy schedule and the specific mistake that allegedly occurred in this case. As we explained in *Hawkins*, "attorney oversight caused by unique and extraordinary circumstances" may provide a basis for finding extraordinary cause, so "the *reason* for the attorney oversight must be considered in determining whether the overall circumstances constitute extraordinary cause." 2014 WL 2854256, at *3. Although the affidavit described in great detail many circumstances occurring in the life of Mr. Wages during the summer of 2020, the affidavit never provided any detail regarding how the mistake at issue allegedly occurred.

Mr. Wages did state that "[t]he Covid-19 virus made my workplace an ever more dangerous environment." He stated that he had two full-time employees who were at high risk of contracting the virus due to one being diagnosed with skin cancer and the other having "pulmonary issues." Mr. Wages stated that in order to protect his employees, "we all social distanced," had protective shields for the desks, were not in the same room at the same time, and did not allow anyone besides the three of them to access the office. Again, however, Mr. Wages did not show that these precautionary measures *caused* the oversight in this case. He said nothing about the process he used for preparing pre-suit notice, how it may have been impacted by the circumstances he cited, or even who made the alleged mistake. His affidavit simply stated, in a single conclusory sentence, "*Because of everything* going on and the disruptions in the office because of the pandemic, and its effect on my homelife, *I just missed the fact* that the HIPAA authorizations were not enclosed in the correct envelopes." (emphasis added). Even though Plaintiff had sent out several batches of pre-suit notice letters on different dates, Mr. Wages never explained how this particular mistake occurred repeatedly or who made it. Indeed, by the defendants' count, the same alleged mistake occurred on four different dates over a 26-day period with 65 separate envelopes. On one of those dates, there was only one envelope to "stuff." Without some detail about how the alleged mistake occurred, it is difficult to say that the oversight was *caused* by extraordinary circumstances. *See, e.g.*, *Est. of Barnwell v. Grigsby*, 801 F. App'x 354, 367 n.11 (6th Cir. 2020) (finding no extraordinary cause where the plaintiff merely asserted that the defendants "made it difficult to get records or interview witnesses"

but never explained "how the availability of such records affected her ability to comply with the pre-suit notice requirement and good-faith certificate requirements of the THCLA").

We note that after the hearing on the motions to dismiss, Mr. Wages filed a supplemental affidavit in order "to provide additional details about the circumstances." He explained that the plaintiff retained him to investigate and potentially pursue the action before the Covid-19 pandemic began in March 2020, and he again described the situation with the delayed expert review and his mother-in-law. He said the "disruptions in my office made it difficult for my staff and me to focus on this case as the deadline for serving pre-suit notice letters approached." He repeated his statement about being the "canary in the coal mine" who went out in public but added that this caused him "to expend large amounts of time out of the office and put a heavy burden on me in addition to the professional burden of maintaining my solo practice and performing my duties as a city judge." Mr. Wages repeated his statements about social distancing and precautionary measures but added that "these restrictions . . . made it difficult for my staff and me to coordinate and work together. And these restrictions disrupted the ongoing day to day operation of my office." He said he was "in a constant state of worry over contracting COVID-19 and passing it along to my family or office staff."

Mr. Wages also cited additional circumstances that had not been mentioned in his original affidavit. He said that when the pandemic hit, he consulted with an IT provider to set up his office to run remotely, and "[w]e were set up to work from home by May." Mr. Wages said his system was then hacked by ransomware. Notably, he did not state that the ransomware attack damaged this file or directly caused the mistake at issue; he simply said it "add[ed] to the stress I was already under." He said he regained access to the system during "the first few weeks of June" and that "it took well past the July 4th Holiday to clean up the mess." Mr. Wages said that he and his staff were making sure that they had regained all the files, the calendar was not affected, they were aware of deadlines, and no clients were harmed, which was in addition to his regular responsibilities and "extremely upsetting." He added, "More than ever before, I had to rely on my family support and staff to keep my practice running." Mr. Wages stated that one of his two assistants was out of the office from June 23 until June 26 for dental surgery and that he "had been relying heavily on [her] due to all the personal and professional turmoil in my life at the time," and her absence "put more pressure and stress on me" as "I simply did not have the time to do everything that needed to be done at home and work." Still, however, Mr. Wages provided no explanation as to how the alleged mistake was made on several different dates in July or who committed the error repeatedly. The most direct description that we can find in the affidavit is a statement that the assistant's absence "made it harder to clean up the mess caused by the ransomware and put us behind on other matters in the office which caused additional confusion *as we were working on preparing* the pre-suit notice letters in this

- 17 -

case." (emphasis added).[2] Then, he added,

> Unfortunately, when *my office* put the releases in the envelopes with the pre-suit notice letters, each provider was sent a release allowing the provider to disclose medical records to the other providers receiving notice rather than a release allowing the provider to obtain records from those other providers. *I was under an inordinate amount of stress*, with the added stress of taking care of my disabled mother-in-law during the pandemic without help, the disruptions caused by enforcing CDC guidelines in my solo practice, my legal assistant's absences from the office, and the mess and stress caused by the ransomware hack, and found it hard to focus at and around the time the pre-suit notice letters were sent out in this case. *Because of everything going on*, the disruptions in the office caused by the ongoing pandemic and their effects on my homelife, as described above, *I missed the fact* that the HIPAA releases were not enclosed in the correct envelopes. Ultimately, I do not believe this mistake caused any prejudice to the Defendants because, as noted above, each provider receiving notice was able to obtain complete records from each other provider being sent notice. However, I normally would have caught and corrected this error if it had not been for my state of mind at the time *my office* served the pre-suit notice letters in this case.

(emphasis added). The supplemental affidavit Mr. Wages filed also added an additional statement that his brother-in-law had "several underlying medical problems," was "sick and hospitalized numerous times in 2020 and 2021," and was admitted to the hospital with pneumonia "shortly before the July 5, 2020 deadline for serving pre-suit notice letters," which caused him and his wife to be "extremely concerned" that he would be exposed to Covid-19.

Notably, the trial court found that "each individual reason cited by Mr. Wages, standing alone, does not constitute extraordinary cause for not complying" with the statute, but it stated that "the cumulative effect of all the reasons" led the court to conclude that the events leading up to the pre-suit notice deadline constituted extraordinary cause. The trial court concluded that all of the combined circumstances "contributed to Mr. Wages not being mentally ready to recognize" the mistake. In order to evaluate whether this combination of events constituted extraordinary cause, the analysis in *Myers* bears repeating:

> "Extraordinary" is commonly defined as "going far beyond the ordinary

---

[2] Mr. Wages also opined that the authorizations were sufficient to allow each provider to obtain records if they simply called and requested them. In that section of his affidavit, he stated, "We were able to properly serve the notice letters by letter dated July 2, 2020, postmarked July 3, 2020, and I sent facially valid HIPAA releases to each of the potential defendants allowing them to release their records to all other providers receiving notice."

degree, measure, limit, etc.; very unusual; exceptional; remarkable." *Webster's New World Dictionary of the American Language*, 516 (1966); *see also State v. Vikre*, 86 N.C. App. 196, 356 S.E.2d 802, 804 (1987) (adopting dictionary definition of extraordinary cause as "going beyond what is usual, regular, common, or customary ... of, relating to, or having the nature of an occurrence or risk of a kind other than what ordinary experience or prudence would foresee"). One legal scholar, commenting on Tennessee Code Annotated sections 29-26-121 and 122, has noted that possible examples of "extraordinary cause" might include "illness of the plaintiff's lawyer, a death in that lawyer's immediate family, [or] illness or death of the plaintiff's expert in the days before the filing became necessary."

*Myers*, 382 S.W.3d at 310-11. Keeping these principles in mind, we conclude that the totality of the circumstances of this case do not rise to the level of *extraordinary* cause. We reiterate that "[o]ur Supreme Court has defined 'extraordinary cause' narrowly" and provided some possible examples. *Owens*, 2020 WL 1888901, at *5. Although we recognize that the listed examples are not exhaustive, we note that the circumstances here are not comparable to any of the listed examples, as there was no "illness of the plaintiff's lawyer, a death in that lawyer's immediate family, [or] illness or death of the plaintiff's expert in the days before the filing became necessary." *Myers*, 382 S.W.3d at 311. Instead, this situation boils down to an instance of attorney oversight (if not clerical error) while under stress. Although Mr. Wages said he was stressed and "missed" the mistake, we still do not know who "stuffed" the envelopes, whether Mr. Wages participated in the process or made any attempt to review them, or whether he simply delegated the entire task to his staff. Mr. Wages simply claims on appeal that "[t]he stress and distraction from these combined events led to the envelope-stuffing error," and that his "degree of stress" was very unusual, exceptional, and remarkable.

However, "[a]ttorney oversight, absent *unique* circumstances, does not constitute extraordinary cause." *Igou*, 2015 WL 1517794, at *9 (emphasis added). We recognized in *Hawkins* that a trial court has "discretion to excuse compliance for attorney oversight caused by unique and extraordinary circumstances." 2014 WL 2854256, at *3. "Section 29-26-121(b) authorizes the trial court to excuse compliance with the section when, in the exercise of its sound and reasoned discretion, the trial court finds that noncompliance *resulted from* extraordinary cause." *Hawkins*, 2012 WL 3007680, at *6 (emphasis added). However, the ultimate result in *Hawkins* also makes clear that an attorney cannot simply point to some stressful event occurring in one's life around the time of the alleged mistake in order to establish extraordinary cause. In fact, this Court has cited *Hawkins* for the notion that attorney oversight "has specifically been found not to constitute extraordinary cause . . . even when the attorney was faced with somewhat stressful conditions." *Piper v. Cumberland Med. Ctr.*, No. E2016-00532-COA-R3-CV, 2017 WL 243507, at *5 n.4 (Tenn. Ct. App. Jan. 20, 2017). Mr. Wages simply failed to demonstrate that the oversight in this case was caused by very unusual, remarkable, and extraordinary circumstances, far

beyond the ordinary degree. Unfortunately, attorney stress is not extraordinary. Although Mr. Wages suggested in response to the motion to alter or amend or revise that repeated mistakes show he was under "crippling stress," there is no similar description in his affidavit, which simply stated that he was "extremely concerned" about various matters and "under an inordinate amount of stress."[3]

We acknowledge that the Covid-19 pandemic was, itself, an extraordinary circumstance, but the experience of Mr. Wages during the pandemic was not. We note that neither Mr. Wages nor anyone in his office or family contracted the virus. In addition, Plaintiff did not show that the mistake here was caused by any particular social distancing measure or the malware attack. As Mr. Wages put it, he "just missed the fact" that there was a mistake "[b]ecause of everything going on." As such, we agree with the trial court's initial conclusion that none of the circumstances cited by Mr. Wages, standing alone, constituted extraordinary cause. We further conclude, however, that his circumstances, in combination, did not constitute extraordinary cause either. *See, e.g.*, *Bidwell*, 618 S.W.3d at 322 (acknowledging that the plaintiff encountered misinformation during his pre-suit investigation and that it "may have caused confusion and created difficulty for the Plaintiff, [but] the facts did not give rise to extraordinary cause"). Discretionary decisions "'are not left to a court's inclination, but to its judgment; and its judgment is to be guided by sound legal principles.'" *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007) (quoting Martha S. Davis, *Standards of Review: Judicial Review of Discretionary Decisionmaking*, 2 J. App. Prac. & Process 47, 58 (2000)). The trial court's decision "was not within a range of acceptable alternatives given the applicable legal principles." *See Kirby*, 2016 WL 3914189, at *6*. Thus, "the trial court abused its discretion when it excused Plaintiff's failure to comply with the requirements of Tenn. Code Ann. § 29-26-121(a)(2)(E) in the absence of extraordinary cause." *See Stevens*, 418 S.W.3d at 559.

## III. CONCLUSION

For the aforementioned reasons, the decision of the circuit court is reversed and remanded for further proceedings. Costs of this appeal are taxed to the appellee, Eugene Moxley, for which execution may issue if necessary.

---

[3] We recognize that Mr. Wages was a solo practitioner. At the same time, however, we note that this Court has repeatedly found no extraordinary cause to excuse compliance even in situations involving pro se plaintiffs. *See, e.g.*, *Breithaupt v. Vanderbilt Univ. Med. Ctr.*, No. M2021-00314-COA-R3-CV, 2022 WL 1633552, at *9-10 (Tenn. Ct. App. May 24, 2022) (declining to find extraordinary cause where the pro se plaintiff relied on a sample notice form provided by a Tennessee attorney who advised her to send it to certain addresses); *Mathes v. Lane*, No. E2013-01457-COA-R3-CV, 2014 WL 346676, at *7 (Tenn. Ct. App. Jan. 30, 2014) (finding no extraordinary cause to excuse an incarcerated pro se plaintiff from compliance with the pre-suit notice requirement); *see also Cude v. Herren*, No. W2010-01425-COA-R3-CV, 2011 WL 4436128, at *6 (Tenn. Ct. App. Sept. 26, 2011) (finding no extraordinary cause where the plaintiff hired her attorney only seven days prior to the running of the savings statute).

_____
CARMA DENNIS MᴄGEE, JUDGE